Your next case, Johnson v. Lamone. Mr. Davis. Good morning. May it please the Court. I'm Mark Davis. I represent the Appellants, Robert Johnston and the Libertarian Party of Maryland. The fundamental problem in this case is that the district court treated a motion to dismiss as if it were a quick and dirty summary judgment motion. In deciding a motion to dismiss, a district court is supposed to accept the facts alleged as true and resolve any factual issues in favor of the plaintiff. But that's not what happened here. Here, the plaintiffs alleged that the 10,000 signature requirement doesn't advance any state interest at all, given that the state already has data reflecting a much higher level of party affiliation. Now, the district court rejected that allegation based largely on factual questions on which we were never allowed to present evidence. First, the court wondered whether Maryland removes voters who move out of state from its voter roles. We assume that Maryland complies with federal law that requires it to do so, but ultimately we'd like to take discovery on that issue and present evidence to show that or Maryland removes voters who die. You know, similarly, we assume that Maryland complies with the law, but we'd like to take discovery on that and present evidence. The court wondered how recent the 22,000 party affiliations are. And, you know, we'd like to take discovery on that and, you know, present evidence. We think there is reason to think that these are recent, given the growth in the party. No, you go. So tell us how those relate to the statute in this case, because I'm assuming you haven't contested that the Libertarian Party in the last applicable election didn't get 1 percent of the total vote, so that puts them into the process of having to requalify. That's right. So what does any of this have to do with that? So I think there's a two-tier system, as the state has pointed out. And our argument is I think everybody agrees we're back to the first tier. So unlike some previous cases where people were challenging the nature of the two-tier system, that's not our argument. I think everybody agrees we're back at the first tier. And our argument is, okay, so we're not in an interest at this first tier of an ensuring that you have a sufficient modicum of political support. We're not contesting that that's a valid interest. But what we're saying is you have information, Marilyn, already in your possession that shows an even greater level of support than what you're asking us for. How is that not a challenge to the two-tier system? Aren't you basically, I mean, I know you resist that in your brief, but you're basically saying it's sort of, it's unacceptable for the state to require more signatures under Tier 2 than it would under Tier 1. Well, there are multiple ways of enacting a two-tier system, and there are actually two parts to the second tier of Marilyn's system. I don't actually understand you to be challenging anything that has two tiers, but I do understand you to be saying it is sort of per se invalid. There's no need to require more signatures to party affiliation to requalify than the number of signatures you would need to qualify in the first instance, and the court's already said that's fine. So the court in, well, I guess I would point out, I assume you're referring to Mathers v. Morris. In Mathers v. Morris, this party affiliations option didn't even exist at that point. As the state points out in their brief, that was passed in 19, I think it was 1998, which was long after Mathers. So that was an aspect of the two-tier system. I may be mistaking the case law, but I thought we had a case saying that it is reasonable for a state to have a relatively lower threshold for ballot access in the first instance, and then require more support to retain its party. The cases do say that, and we're not challenging that. So, for example, Marilyn, we don't have a problem with Marilyn, for example, saying if you don't get 1% of the votes in the last election, then you have to show, you know, 10,000, support of 10,000 people. We're not arguing that in all circumstances this two-tier system has to collapse. We're challenging the application of the second, of the first tier in one particular set of circumstances. So what's the basis for that challenge? I mean, Marilyn's come up with this system, which has been approved before, and you disagree with it. So what? This aspect of the system has never been approved before. I'm not aware of any prior case that has challenged, that has made the argument that when Marilyn already has information in its possession showing an even greater level of support, that the state can nevertheless force a party to go through expensive, busy work to prove something that it already knows. That's an argument that's never been raised in any of the prior cases. And I think that under this circumstance, what the Supreme Court said in Crawford, it emphasized that it doesn't matter how small we think the burden is or how large we think the burden is. If there's any burden, it has to be balanced against a state interest. And our allegation, which we made in the complaint, is that there's, the state's interest is not advanced one iota by requiring 10,000 petition signatures. Now, the state can try to take issue with that and present evidence, and we can present evidence, but we think we're entitled to prove the allegations. Present evidence? If it's just a modest burden, why isn't it enough to say, look, the state could reasonably think that it wants to require more support to retain party status than it can? Under Tier 1, those signatures can only be two years old. It is reasonable for the state to assume that that is better evidence as to current levels of support than signatures that are permitted to be older. Yeah, I think that's something that's worth talking about, because the state has, yeah, I'm sorry. The state has repeatedly said that all they have to do is articulate an interest, and then basically the game's over. And I think the state is over-reading the cases on that. If you take the state's argument, you're basically converting this stage of the Anderson verdict analysis to rational basis review. But in McLaughlin, the court emphasized that that's not how the standard works. In footnote 6 of McLaughlin, the court said that even when the burden is not severe, that doesn't convert this to rational basis review. Rational basis review says, you know, all the state has to do is articulate some interest, and then we're done. So I think what the, and the court did use this language in Alcorn. It quoted the Supreme Court in Timmins. But what it said was that the state doesn't have to offer elaborate empirical verification of the weightiness of its interest. What we're contesting here is not the weightiness of the state's interest. We don't contest that the state has an important interest in ensuring that parties have a sufficient modicum of political support. Alcorn was a 12B6 case. Alcorn was and They weren't required to come forward with any evidence other than stating the general principles. So in Alcorn, the, I think the dispositive fact was that the court found that the plaintiff had not alleged any burden of any constitutional significance. So Alcorn was a case, it wasn't about whether somebody could access the ballot. Everybody agreed that the plaintiff in that case was going to be on the ballot. It was a case about whether, where on the ballot, the order that the parties would appear in. And the court said there's no constitutional interest whatsoever in ballot ordering. And so there was no, there was nothing to balance. Is it your argument that here there's greater than a modest burden? So the term modest is, I think, used imprecisely in some of the cases. Yeah, but that's the term we use, and now we're stuck with that. No, I understand. But I think if what you're, Timmons has made clear, the court stated that it's not a binary thing. There's, there are burdens somewhere between, you know, whatever you want to call it, modest or trivial on hand and severe on the other. And it is our view that it's not a trivial burden. We think that the district court trivialized the burden when we alleged that this is going to consume the party's entire budget. You know, we can have That would be true for anybody that found themselves in this situation, wouldn't it? Well, I think, and I mean, the State has tried to say that you shouldn't consider that because we're trying to make some sort of unique, individualized assessment. And I think our point is that the Libertarian Party is the most successful third party ever in Maryland, that if it takes up the Libertarian Party's whole budget, this is going to take the whole budget of any third party. Isn't there a pretty, I thought, independent and third parties often appear on the ballot in Maryland. It is true that independent parties have often appeared on the ballot. If you look at the Going through the motions of getting 10,000 signatures and then not doing much else and dropping off in the district court, the State submitted some of the history of these parties. And you'll see something like 12 political parties in Maryland history. And right now, there's only one recognized political party, third party in Maryland, which is the Bread and Roses Party, which is a brand new party. So I think our point here in considering the burden is, yes, we've historically met the 10,000 signature requirement, but we've done so at great cost. And, you know, if doing so requires the party to expend its entire budget, there's not much left to do other things like engage in political speech, like try to win voters over, the things that you expect a party to do. This is a practical question. It struck me, if you say you have 20 some thousand registered libertarians, how hard would it be to go to those 20,000 to get your 10,000 signatures? Seems like you'd want to do that anyway, to raise money and develop leadership teams in each county and all that sort of stuff. I understand that. And I'm not an expert in, you know, how we would go about doing that and what the sort of rate of response would be to that sort of, I assume it would be some sort of mailing. But I have to say that since the party has historically found that the most efficient way to get signatures is to conduct these campaigns in grocery store parking lots, I have to infer that they've found that to be the most efficient way to get the signatures. Well, if we're going to infer that, can we also then infer something about the level of current support that actually is indicated by the 22,000 affiliates? I don't think so. The state, I mean, I know that... If it's a faster way to get 10,000 signatures to go to Safeway than to go to your list of 22,000, doesn't that tell you something about the list? Well, I think that may be true of any political party. People get these mailers, bulk mailers, and my guess is that most of them end up in the trash without being opened, regardless of who it's from. You know, in terms of... But you know, going back to your question, again, the level of support, it's a factual question. And you know, I think that we could have... We would have liked to get discovery from the state on, you know, what percentage of these registrations that we have are new. Looking at the records that the state does put online, we see consistently, every month, substantially more people were transferring into the party than were transferring out. Now, if you believe the state's theory that these are all sort of stale, you would expect support for the party to be decreasing, not increasing. I feel like that... I don't want to beat this dead horse. That all seems like it would be really relevant if we were under something like a strict scrutiny standard. But we're not. And it's not as though it's facially implausible for the state to think, look, signatures that were gathered in the last two years are overall going to be a better indicator of current support than signatures that have no... You know, we don't know when they were collected. And I feel like, I mean, we have said that you don't need a particularized showing of necessity when you're talking about a modest burden. And so I don't quite understand why this matters. So, I think I understand the question, but I think my answer is that we're certainly not asking, we're not saying that you have to require narrow tailoring in the way that you would for strict scrutiny. But I think what we're saying is different. And the cases do say that you have to require that the interest articulated by the state, I think the Supreme Court has used the term, has to be relevant to, or it has to actually further the interest that the state is asserting. And when you have particularized allegations in a complaint that give reason to think that petition signatures aren't telling the state anything new. We've alleged, for example, that 99.5 percent of petition signatures come from Democrats and Republicans. It really doesn't show you anything about the current level of support for the party. We've alleged that, you know, the petition doesn't ask anybody whether they actually support the party. It alleges, you know, that doesn't tell you very much about the level of support. And so I think part of the question here, it's a comparative thing, right? Which one is better? And we've alleged facts in the complaint that suggest that party affiliations are a much stronger level indicator of support than are petition signatures. And I think at the motion to dismiss stage. You're not interested in going to this base that you have to pick up the 10,000 signatures. Not if it's costly. I'm sorry, I see my time has run. Well, you've got some rebuttal. All right. Thank you very much. Mr. Trento. Thank you, Your Honor. May it please the Court. My name is Andrea Trento. I'm with the Attorney General's Office of the State of Maryland. The Constitution authorizes states to require a party to demonstrate a modicum of support before granting that party access to its ballot. Maryland does this in two ways. It establishes a low threshold of 10,000 signatures on a petition for parties to initially gain access and then it requires a demonstration of growth over two election cycles for the party to remain recognized without having to go through the petition process again. There's no question that this scheme is constitutional on its face. This Court has already affirmed the scheme, a more restrictive version of the scheme in the Mathers case and more recently in the Pisano case. It affirmed a scheme in North Carolina that is far more restrictive than the one that Maryland has adopted. Now, the plaintiffs think that Maryland should measure the modicum of support differently because they have found a measure that's easier for them to meet. Maybe they're right that as a policy matter, Maryland should go this route, but whether they or any other party would prefer to base recognition or modicum of support on the number of registered voters or the number of votes their candidate received in the last election, the number of subscribers to their newsletter, the number of attendees at their annual convention, that's a question for the General Assembly of Maryland. This Court is not required to even consider the change that the plaintiffs are proposing. The dismissal should be affirmed. The alleged burdens here are not in dispute. Plaintiffs allege that time and resources required to gather 10,000 signatures are weighty and severe. What is in dispute is whether the District Court properly considered those allegations of burden in concluding that the burden was not severe on a 12b6 motion. It's clear that it did. It referenced those very allegations of time and resources that the plaintiffs alleged in ruling, but the plaintiffs' problem is that even accepting those allegations is true, it does not amount to a severe burden as a matter of law. The Mathers case, this Court found that 10,000 signatures was modest. The Pisano case, this Court found that 85,000 signatures in conjunction with a post-primary filing date, which is what we have in Maryland, did not rise to the level of a severe burden. The plaintiffs say that discovery is necessary for the first time in their reply brief because the cost of collecting signatures may not be static over time. If anything, probably the opposite is true. The Whitley case, there's a case in Maryland called Whitley v. State Board of Elections. It's dated from 2014. It actually allows for the distribution of petition forms online and permits signers of the petition to both sign and witness the form that they sign. What that means is that the Libertarian Party can communicate via email or via online distribution of its petition with its 22,000 members to effectively distribute petition forms and have those returned. In any event, the Pisano case, again, held that 85,000 signatures in combination with the post-filing deadline did not impose a meaningful burden just a few years ago. It's not plausible under the Twombly and Iqbal standard that the costs have risen so drastically that 10,000 signatures today is an excessive burden. The second reason why the plaintiffs' claims are not plausible was alluded to by my colleague's presentation. The Libertarian Party has been immensely successful in recent years of obtaining ballot access in Maryland. Just from the allegations of the committee, they've placed presidential candidates on the ballot since 1980 and on the gubernatorial ballot since 2002. It has enjoyed consistent ballot access since 2004. It's qualified for continued recognition based on electoral performance in 2014 and throughout most of its history, it has successfully attracted at least 10,000 signatures for party recognition. Now, notwithstanding the law and notwithstanding the plaintiff's own history of success in obtaining access to the ballot in Maryland, they argue that they should be given the opportunity to show that the 10,000 signature requirement is uniquely burdensome for them. This is wrong for several reasons. First, they haven't pled facts to suggest that they have a plausible claim that it is in any meaningful way, that it's constitutionally burdensome in any meaningful way. The time and expense of collecting signatures is burdensome. We know this and to some extent, that's the point. Plaintiffs say that parties of limited resources should be constitutionally exempt from that requirement, but that is an exemption that in the context of third parties would swallow the rule, particularly given that what we have here is the Libertarian Party seeking this relief. The Libertarian Party is, by recent standards, the most successful third party in Maryland recent history. And so in the record at page JA325, there's a list of other parties that voters of Maryland have chosen voluntarily to affiliate with. There are several dozen parties listed on that form. It was submitted in connection with the preliminary injunction motion. I refer to it only to show that there are many other parties out there who with resources that are almost certainly less broad and less expansive than those of Libertarian Party who would similarly take advantage of this rule. I'm just curious. What's the Bread and Roses Party? The Bread and Roses Party, I don't want to speak for what their aim is. They have a website if you care to visit it. But they're a party that just recently gained access, I think it was January of 2019. Their founder had initially sought the Democratic nomination in the 2018 for Senate, but they're up on the web and you can... So they got the 10,000 signatures. They did. They got the 10,000 signatures. They haven't had an election since then that would bring them under the next subchapter. That's correct. But they would be free in this election to nominate a candidate for the presidential ballot for any other election that takes place in Maryland. Can I ask you a question about the second part of the case, the name standard? Yes, sure. Is that what it's called? Yes. What's the state's position on whether in 2020 it will rely on invalidated petition signatures for other purposes? Historically, what the state has done is it receives petitions filed by not just by political parties, but ballot questions, any petition of that nature. And there is a specific statutory standard required that the state board does not have the authority to disregard regarding when a signature needs to be accepted. But if based on the totality of the evidence available on the petition form, available in the state board of elections records, their online voter registration database, they can ascertain that somebody signing the petition, even if they left off a middle initial or even if they used a common nickname instead of their given name, is the same person that's on the voter rolls. They will go ahead, even if as a matter of Maryland law, they're not allowed to accept and validate that signature for purposes of counting it on the petition, they will go ahead and change the information in the voter registration database because they don't have the same legal restriction with regard to that. So why doesn't that present a claim that is ripe? I mean, it seems like a purely legal question, albeit contingent on the party actually proceeding to obtain signatures again. But as I understand the claim is, as you just phrased it, on the one hand, the board is rejecting signatures pursuant to the statute, but on the other hand, accepting them is genuine for other purposes. So why can't the district court decide whether or not that violates the plaintiff's rights? Well, there are four reasons for why it's not ripe. First, there's not a petition that's been filed. Just the very absence of a petition means that this court would be rendering an advisory opinion on what the signature standard means. Second... I thought... Well, I guess this isn't part of the pleading, but I thought somewhere in the briefs the Libertarian Party averred that it was in fact collecting signatures. They mentioned that in their briefs. I don't believe it's in any sort of record or it's alleged in the complaint. I think... Let me go to that point, which there hasn't been a petition filed. It hasn't been determined to be insufficient. The reason for why it's insufficient hasn't been determined to result from the application of the signature standard. So those are three reasons right there. But fourth reason is... So, before you... If they are collecting signatures now, none of those have been challenged? That's correct, Your Honor. Unless it's happened and I haven't been made aware of it, I don't believe they've filed a petition that then triggers the... You haven't filed a petition before there would be any analysis of whether a signature was invalid. That's correct. The validity gets determined when the petition gets filed because the signatures get reviewed to make sure they're registered voters, et cetera. But the reason for why this doesn't present, even given, assuming that that's true, that they're out there collecting signatures, they say they need a ruling from this court so they can instruct their circulators and the circulators can instruct voters as to how to sign the petition forms. The problem with that is, even accepting that allegation is true, it just doesn't make sense based on the nature, based on how it is the State Board goes about taking the information from petitions and changing the information in the voter registration database. It's a process that is very fact-specific with regard to individuals on the voter rolls. If the information presented by the petition gives the State Board comfort that, yes, we can't tell you, I think as a general matter, what that information is, but if we can tell from the name and address, et cetera, then we'll go ahead and update the record. The plaintiffs want a ruling from this court that says, State Board of Elections, any time you can identify the person, you should also accept that signature for the purposes of counting the signatures on the petition. The problem from an ex-ante perspective is that the plaintiff's circulators and the voters themselves who sign the petition aren't going to know what that mix of information is. The instruction given to signers should be, this is what the law requires. You sign one of your given names, you sign your surname, and if there is another given name, you should have at least an initial of that name, and you can't use nicknames. It wouldn't make sense to say to signers, oh, well, we have a ruling that says whenever the State Board can identify you, it doesn't matter. I just don't understand how the instructions are going to be any different. I get that, but I guess from the party's perspective is they're suggesting that the board's practices are arbitrary, because on the one hand, they're accepting them for one purpose. On the other hand, rejecting them for another. Well, I still don't see how that's a ripe issue presented to the court, because they haven't been harmed by it at all. It's just not presented. Their petitions haven't been rejected, nor is it the case, as I just mentioned, that they would go about doing things or should go about doing things any differently on the basis of a ruling that from this court or from the district court did say that this, the way that Maryland counts signatures, is improper. I do take your point about one of the things we look at is how burdensome is it to wait until this really gets a little more concrete, and you're saying it doesn't matter because you do the same thing when you're looking for signatures. But how will this work? How, so they will file a petition, and let's just assume hypothetically half the signatures get kicked out and some portion of them are being used by the state for other purposes, so they raise this arbitrariness claim. So when will this get litigated, and won't it be too late? Well, in this case, Your Honor, the plaintiffs filed a motion for a preliminary injunction on January 22nd, 2019. That motion was heard on January 31st and adjudicated on January 31st. I think the district court is well-equipped to move with as much speed as it needs to in order to meet, you know, ballot deadlines, and I would submit that would be a more appropriate time to do that, as opposed to... It wouldn't make more sense sort of for everyone, including the government, just to have the district court deal with this claim now, so you know what you can and can't do in 20? Well, I mean, I understand that impulse. I just think it's asking the court to render a decision that may not arise, and I think the Constitution really counsels against doing that, point one. And point two is this court has actually already reviewed and adjudicated this issue that's been presented in the context of a petition to get a ballot question on the ballot. What happened in that case is the court found that ballot questions don't implicate the way ballot access does, or individual ballot access does, and so it wasn't the kind of case that's subject to the same Anderson-Burdick analysis. But what the court did said, okay, well, accepting that this doesn't implicate the right to vote, it still raises valid concerns about, you know, about, you know, how these things are supposed to be counted. And so we'll assume that there's no burden or there's a modest burden, but we'll go ahead and examine under the second prong of the Anderson-Burdick test whether this furthers a state interest. So the court treated the burden as modest and then examined under Burdick whether this furthered a state interest, again, without reference to empirical support, just as long as the state can articulate a valid interest. And the court found that it did. This is the Kendall v. Balzerak case. And so that would be another reason the court really is bound by that. If it finds that the burden is a modest one, or I should say the burden is not a severe one, that's the course that the court should take. Does it matter, did that case involve a claim that the state was using the signatures for other purposes, and does that matter? Your Honor, I can't, I believe it did, but off the top of my head, I can't speak to that. Let me address another interest that I think is specifically related to the relief that plaintiffs are seeking. Again, this is not the ripeness, this is not count two, this is back to count one, unless the court has any more questions about count two. And this is the interest in administrative efficacy and efficiency that the State Board of Election has in managing the process by which parties get admitted or get recognized by the state of Maryland. And that's, if the plaintiffs are right that a party could marshal alternative evidence to support the modicum of support that they have in the community in order to obtain recognition by the state, every instance of a party seeking to obtain recognition would become a court case. Because what would have to happen is the state would have to determine whether, well, is the evidence that's being presented here, even though it's not the 10,000 signatures and it's not the second tier, but is this enough, is this an alternative basis that we should be granting recognition? For the plaintiffs, they're using registered voters. Now, the second tier that we have in Maryland also has one component of that is you can remain qualified if you have a sufficient number of registered voters. That sufficient number is 1% of registered voters. If the Libertarian Party, as of December 31st, 2018, had some 40,000 registered voters as opposed to 22,000, then it would remain qualified under Maryland law. The plaintiffs want to get rid of that, I understand. But if that were the case with any other party, just looking at the registered voters, the Green Party has some, I don't believe they have 10,000 registered voters, or at least as of December 31st, but they have some number there. The implication of what the plaintiffs are asking for is that the Green Party could come in and say, well, we're only going to submit a petition with 3,000 signatures, whatever their number of registered voters, 10,000 minus whatever their N of registered voters is, because under the Libertarian Party case, we should get credit for the registered voters we have. It doesn't stop there. The Green Party is the second most successful party in Maryland history. There are dozens of other parties that people have either affiliated with or that have attempted to gain access to the ballot. They would all be subject to this. But why should it stop with registered voters? What about attendees at the last party convention? In the Mathers case, this was raised because in Mathers, the Libertarian Party had obtained 14,000 votes, their candidate for governor had obtained 14,000 votes in the prior election, and they were bristling at having to collect 10,000 signatures to regain access. The same argument could be made in that circumstance. Why should we have to go collect petition signatures when a month and a half ago, our In this case, the Libertarian candidate in 2018, I believe, received some 20,000 votes. And so that argument would be available, too, that the Libertarian Party hasn't chosen to make it, but some other party might choose to make it. And once you open the floodgates is the wrong analogy, but once you say that the state's reasonable way of measuring a modicum of support in the community can be accepted if a party can come forward with alternative means of showing that, well, then the sky's the limit. Subscribers to the newsletter, attendees to the convention, there are any number of ways that a party can say, well, no, these signatures are expensive for us, it's burdensome for us. We have this other way of showing we have support in the community that amounts to more than the 10,000 signatures we should require. The court has already found that 10,000 signatures is a modest burden. The court has found that the two-tier systems, two-tier systems far more restrictive than Maryland's are acceptable under the Constitution. It shouldn't allow exceptions from that just because a party here says it's going to be expensive for us to comply. So unless the court has any questions, I'll rest my papers. All right. Thank you very much. Thank you, Your Honor. Mr. Davis, you have some time left. So I want to start on count one and then I'll talk briefly about the ripeness question. You know, the state gets up and says that this scheme has been affirmed over and over, but I think it's important to emphasize that this is an as-applied challenge and this particular question has never been raised in the past. The issue in the past cases was when the state knows nothing in a vacuum, does it have, you know, can it require parties to demonstrate a certain level of political support? And the cases have said, yes, you know, 1% might be enough for, in Mathers, it was 3%. But this particular issue has never been raised in the prior cases where the state already knows information. Its own records already show a certain level of support. Can it still make a party go out and do busy work? We think the answer is no. In terms of this question of administrative efficiency and, you know, opening the floodgates. This is a question about the statute. If Maryland had simply decided to eliminate that tier one requirement after the initial petition and simply rested on the first two prongs, would that be a problem? I don't think we would be able to argue that that's a problem unless there were something different about the scheme. Why is the fact that Maryland has provided a different opportunity for a party to get on the ballot a burden? Well, so the problem with these various percentages, the courts have said that the percentages are in some sense arbitrary and the state sort of gets to choose what level of support, you know, as long as it's within a reasonable range, what level of support it wants. But once the state has chosen and admitted what its interest is, if its interest here is in finding that 10,000 people support the party, then it can't take, I don't think it has any interest in not, in ignoring evidence in its own possession that there's already a greater level of support for that. Even though that evidence forms the basis for retention under tier two? Yeah, I think the fact that the state has decided under tier two that it might accept some larger number of affiliations, I don't think changes the fact that at tier one, it's what you need to demonstrate is support from 10,000 people. And so, you know, it's arbitrary to say that we are going to ignore evidence in our own possession that's already in our records. So going back to the question of efficiency, I don't think our argument opens the floodgates at all. Council references this potential that other parties could ask the state to look at other evidence or cobble together various pieces of evidence. And I agree, the state would likely have a strong argument in those cases that the interest in administrative efficiency counsels against that. But the difference is, in this case, we're not asking the state to cobble anything together. We're not asking them to look at evidence that they've never seen before. We're asking them to look at something they already know that's already reflected in their own records. And in that case, there's no sort of administrative efficiency interest in ignoring something. Even under your theory of the case, don't they have to look at those 22,000 signatures and make sure all of those people, I guess at a minimum, still live in Maryland, but also signed within the last two years? Otherwise, it's not equivalent. So they are, I agree on the first point. Well, on the first point, I think they're already supposed to be doing that. If they're complying with the law, then, you know, they're supposed to be removing voters who move out of state. They're supposed to be removing dead people. And on the question of the recency, I don't think it's our position that there's sort of a two-year cutoff. Our point is that- It's Maryland's position that there is. That is their Tier 1 requirement. Isn't it that you have 10,000 signatures gathered within the last two years? Petition signatures gathered within the last two years. But I think our point is that even, that voters have a very strong interest, a very strong incentive, if they change their mind, to register as a Democrat or Republican so they can participate in those primaries. You know, maybe they are just like a guy who signed the Libertarian card at his frat party, and then he turned 22 and decided, I'm not a Libertarian anymore. But he didn't re-register. And then he forgoes the right to vote in any primary. There are strong reasons to think that people would change, and to the extent that's happening, it would happen both ways, right? It's counter- I'm sorry, because I don't want to get us into a factual argument. I thought your argument was, these are sort of entirely redundant things. And so it's irrational to ask for more than 10,000 signatures under Tier 2, because you will take 10,000 under Tier 1. These are redundant. But they're not quite redundant, because Tier 1 has that two-year thing attached to it. So I don't see how, at a minimum, you wouldn't be asking the state to go through those 22,000 signatures and make sure all of them were signed in the last two years. So- I see my time's up. Can I- Go ahead. So I think the answer is that- You're saying the state should just assume that the two-year thing is silly. The state shouldn't worry about the two-year thing. So our point is that party affiliations, regardless of their age, are stronger evidence of support, even of the current level of political support, than petitions from 99% of which are signed by people who don't even agree with the party. Thank you very much. We'll come down to Greek Council and then move on to our last case.
judges: G. Steven Agee, Albert Diaz, Pamela A. Harris